**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

HELAMAN HANSEN,
*Defendant-Appellant.*

No. 17-10548

D.C. No.
2:16-cr-00024-
MCE-1

ORDER

Filed July 25, 2022

Before: M. Margaret McKeown and Ronald M. Gould,
Circuit Judges, and Jane A. Restani,* Judge.

Order;
Concurrence by Judge Gould;
Dissent by Judge Bumatay;
Dissent by Judge Collins

---

\* The Honorable Jane A. Restani, Judge for the United States Court
of International Trade, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel denied on behalf of the court a petition for rehearing en banc in a case in which the panel's opinion, which vacated convictions on two counts of encouraging or inducing an alien to reside in the United States for private financial gain in violation of 8 U.S.C. § 1324(a)(1)(A)(iv), held that subsection (iv) is overbroad and unconstitutional because its narrow legitimate sweep pales in comparison to the amount of First Amendment protected expression it encompasses.

Judge Gould concurred in the order denying rehearing en banc. He wrote that Judge Bumatay's dissent seeks to rewrite subsection (iv) by conducting a so-called textual analysis that fails to analyze the text of subsection (iv) itself; analyzes additional words not in that section, such as "aiding," "abetting," and "solicitation," to support the conclusion it advocates; misreads the opinion, the record, § 1324 itself, and precedent; conjures up parades of horribles belied by its own citations; introduces arguments the Government's Petition for Rehearing did not make; and asks this court improperly to disregard Supreme Court precedent regarding the applicability of the facial overbreadth doctrine. Noting that Judge Collins's dissent does not criticize the Supreme Court's existing doctrine of facial overbreadth but urges that the panel misapplied that doctrine, Judge Gould wrote that the application of a rule of law that is agreed upon does not normally warrant en banc or other further review;

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

and that in view of the defendant's fifteen remaining counts of conviction and the fact that few convictions for deplorable conduct rely only on subsection (iv), there is not "exceptional importance" to further review the two counts of conviction that were reversed under the facial overbreadth doctrine.

Judge Bumatay—joined by Judges Callahan, Ikuta, R. Nelson, Lee, VanDyke, Bennett (in all except Part III-A), and Bress (in Parts I, II, and III-B)—dissented from the denial of rehearing en banc. He wrote that the panel (1) misread the statute by blindly relying on lay-dictionary definitions to reach an overly broad interpretation of the law instead of following the established principle of looking to the settled meaning of the statutory terms to understand that § 1324(a)(1)(A)(iv) is an ordinary solicitation and aiding-and-abetting statute and poses no free-speech concerns; (2) improperly invoked the surplusage canon to disregard § 1324(a)(1)(A)(iv) as a solicitation and aiding-and-abetting statute; (3) failed to respect the constitutional avoidance canon; and (4) shouldn't have pulled the trigger on overbreadth invalidation—a remedy of last resort—even if the provision could conceivably reach some protected speech.

Dissenting from the denial of rehearing en banc, Judge Collins concluded that (1) under the canon of constitutional avoidance, the court can and should interpret the statute as being limited to soliciting and facilitating the unlawful entry of, or the unlawful taking up of residence by, specific aliens; and (2) so construed, the statute is not facially unconstitutional. He wrote that facial invalidation is particularly inappropriate here, given that the defendant was convicted of an *aggravated* version of § 1324(a)(1)(A)(vi) offense, one that required the Government to prove the

additional fact that Hansen acted "for the purpose of commercial advantage or private financial gain." 8 U.S.C. § 1324(a)(1)(B)(i).

**COUNSEL**

Carolyn M. Wiggin (argued), Assistant Federal Defender; Heather E. Williams, Federal Defender; Office of the Federal Defender, Sacramento, California; for Defendant-Appellant.

Katherine T. Lydon (argued), Assistant United States Attorney; Camil A. Skipper, Appellate Chief; Phillip A. Talbert, Acting United States Attorney; United States Attorney's Office, Sacramento, California; John M. Pellettieri Jr. (argued), Appellate Section, Criminal Division; Lisa H. Miller, Acting Deputy Assistant Attorney General; Kenneth A. Polite Jr., Assistant Attorney General; United States Department of Justice, Washington, D.C.; for Plaintiff-Appellee.

Vera Eidelman (argued), American Civil Liberties Union Foundation, New York, New York; Cecillia D. Wang, American Civil Liberties Union Foundation, San Francisco, California; Shilpi Agarwal, American Civil Liberties Union Foundation of Northern California Inc., San Francisco, California; for Amici Curiae American Civil Liberties Union and American Civil Liberties Union of Northern California.

**ORDER**

Judges McKeown and Gould have voted to deny Appellee's petition for rehearing *en banc*. Judge Restani recommends denying the petition for rehearing *en banc*.

The full court has been advised of the petition for rehearing *en banc*. An active judge requested a vote on whether to rehear the matter *en banc*. The matter failed to receive a majority of votes of the non-recused active judges in favor of *en banc* consideration. *See* Fed. R. App. P. 35.

The petition for rehearing *en banc* is **DENIED**.

---

GOULD, Circuit Judge, concurring in the order denying the petition for rehearing *en banc*:

I concur in the order denying rehearing *en banc*.[1]

Judge Bumatay's dissent (the "Judge Bumatay dissent") from the denial of rehearing *en banc* is wrong on the law and incorrect in method. As for Judge Collins's dissent (the "Judge Collins dissent"), it does not appear to challenge the facial overbreadth doctrine generally; rather, it appears to disagree with the *Hansen* opinion's application of this Supreme Court precedent. I address the lengthy Judge Bumatay dissent in depth and the Judge Collins dissent in footnote 2 *infra*.

In arguing for *en banc* rehearing, the Judge Bumatay dissent seeks to rewrite subsection (iv) by conducting a so-

---

[1] I do not seek joins in this concurrence.

called textual analysis that fails to analyze the text of subsection (iv) itself.  Rather, the Judge Bumatay dissent analyzes additional words not in that section, such as "aiding," "abetting," and "solicitation," to support the conclusion it advocates.  In the course of its argument essentially rewriting subsection (iv), the Judge Bumatay dissent misreads the opinion, the record, § 1324 itself, and precedent; conjures up parades of horribles belied by its own citations; and introduces arguments the Government's Petition for Rehearing did not make.  The Judge Bumatay dissent ends by asking us improperly to disregard Supreme Court precedent regarding the applicability of the facial overbreadth doctrine.

## I.  Correcting the Record

As an initial matter, I comment on several issues upon which the Judge Bumatay dissent is confused or mistaken.

## A. The Judge Bumatay dissent mischaracterizes the holding of *Sineneng-Smith*, 140 S. Ct. 1575 (2020)

The Judge Bumatay dissent begins by invoking the Supreme Court's unanimous decision vacating and remanding a separate Ninth Circuit panel's decision regarding the constitutionality of subsection (iv).  The Judge Bumatay dissent contends that the Supreme Court in its prior decision was only "mostly concerned" with the prior panel's violation of the party-presentation principle, but also expressed views about the merits of subsection (iv).  A fair reading of *Sineneng-Smith* shows that the Judge Bumatay dissent's position is incorrect.  The Supreme Court's *only* holding in *Sineneng-Smith* was that the panel violated the party-presentation principle.  *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1578 (2020) ("[W]e now hold that the appeals panel departed so drastically from the principle

of party presentation as to constitute an abuse of discretion. We therefore vacate the Ninth Circuit's judgment and remand"). The Supreme Court made no holding concerning the merits of the facial overbreadth challenge to subsection (iv).

The Court in *Sineneng-Smith* was unanimously concerned with the party presentation-principle, the fact that the parties in that case had not even briefed facial overbreadth, and the fact that the Ninth Circuit had requested amicus briefing on the issue of overbreadth. Even the Government's Petition for Rehearing recognizes that the Supreme Court in *Sineneng-Smith* did not make a decision on the merits. *See* Pet. for Reh'g at 1 ("[T]he Supreme Court ultimately reversed on alternative grounds in [*Sineneng-Smith*], without resolving the merits of the overbreadth issue").

The Judge Bumatay dissent recognizes the weakness of how it frames the issue at the outset with reference to *Sineneng-Smith*, because it soon thereafter excludes the opinion's alleged failure to adhere to *Sineneng-Smith* from the Judge Bumatay dissent's purported list of errors committed in the opinion. If the *Hansen* opinion had violated clear Supreme Court precedent in *Sineneng-Smith*, that violation would be a central thrust of the Judge Bumatay dissent; but, the Judge Bumatay dissent's later silence is a recognition that the opinion violated no such precedent. I note that two separate and unanimous panels of this Circuit have held that subsection (iv) is facially overbroad. *See United States v. Hansen*, 25 F.4th 1103, 1111 (9th Cir. 2022); *United States v. Sineneng-Smith*, 910 F.3d 461, 485 (9th Cir. 2018), *vacated and remanded*, 140 S. Ct. 1575 (2020).

## B. The Judge Bumatay dissent misstates Hansen's conviction under subsection (iv)

The Judge Bumatay dissent emphasizes the deplorable conduct that Hansen committed. I agree that the conduct was deplorable and egregiously fraudulent. But although Hansen's conduct was deplorable, such a determination does not bear on the opinion's analysis of a facial overbreadth challenge. The facial overbreadth doctrine is not concerned with the defendant's conduct, but rather with the amount of legitimate speech that would be chilled or deterred by the provision that the opinion held unconstitutional, in relation to the amount of speech that can constitutionally be prohibited.

Further, the Judge Bumatay dissent is incorrect regarding the facts of Hansen's convictions and sentencing. Contrary to the Judge Bumatay dissent, Hansen was not convicted under subsection (iv) for defrauding approximately 500 aliens. The counts of conviction and sentencing under subsection (iv) related to Hansen encouraging and inducing only two specific aliens to overstay their visas. *See Hansen*, 25 F.4th at 1105–06. Hansen was also convicted of twelve counts of mail fraud and three counts of wire fraud for defrauding the approximately 500 aliens. *Id.* at 1105. The panel affirmed these convictions in a simultaneously-filed memorandum disposition (which memorandum disposition the Judge Bumatay dissent ignores). *See id.* at 1105 n.1; *United States v. Hansen*, No. 17-10548, 2022 WL 424827, at *1 (9th Cir. Feb. 10, 2022). Hansen was sentenced to 240 months for each of the fifteen fraud violations and 120 months for both of the two subsection (iv) violations, all to be served concurrently. *Hansen*, 25 F.4th at 1106. The opinion's reversal of the two subsection (iv) convictions did not negate

all of Hansen's other convictions for which he was punished and sentenced.

## C. The Judge Bumatay dissent misinterprets the mens rea requirement at issue

The Judge Bumatay dissent is correct that Hansen's subsection (iv) conviction and sentence also "requires proof that the defendant acted to obtain 'commercial advantage or private financial gain'" under 8 U.S.C. § 1324(a)(1)(B)(i). However, the Judge Bumatay dissent is incorrect to the extent it suggests that "[a]ny statements prosecuted under this law must be designed to make money off the targeted aliens—fitting solicitation and facilitation." As the *very next* subsection of the statute, ignored by the Judge Bumatay dissent, makes clear, an individual can be convicted under subsection (iv) regardless of whether he acted to obtain commercial advantage or private financial gain. *See* 8 U.S.C. § 1324(a)(1)(B)(ii). Hansen did not challenge the constitutionality of § 1324(a)(1)(B)(i). *See* Resp. to Pet. for Reh'g at 7 n.1. In short, acting for commercial advantage or financial gain is not an element of the criminal offense defined in subsection (iv). Any person can be convicted of that offense without seeking financial gain.[2]

---

[2] The Judge Collins dissent, unlike the Judge Bumatay dissent, makes no assault on the Supreme Court's existing doctrine of facial overbreadth. Instead, the Judge Collins dissent urges that we have misapplied that doctrine because in the Judge Collins dissent's view there is little doubt that the legitimate sweep of subsection (iv) "greatly exceeds any possible overbreadth." The Judge Collins dissent does not criticize the Supreme Court's doctrinal statements on facial overbreadth and the First Amendment values that doctrine serves. The application of a rule of law that is agreed upon does not normally warrant *en banc* or other further review. *See* Fed. R. App. P. 35(a); *see also* S. Ct. R. 10 ("A

## D. The Judge Bumatay dissent manufactures an imaginary circuit split

The Judge Bumatay dissent errs when it contends that the opinion "lead[s] a circuit split" and cites *United States v. Tracy*, 456 F. App'x 267, 272 (4th Cir. 2011) (unpublished).[3]  *Tracy* is an unpublished case.  As in the Ninth Circuit, in the Fourth Circuit "[u]npublished opinions are not binding precedent."  *See Tracy*, 456 F. App'x at 268. The *Hansen* opinion cannot have created a split with the Fourth Circuit relating to *Tracy* because *Tracy* was not a precedential opinion of that circuit.  Simply put, there is no circuit split.  *Cf. Reynolds Metals Co. v. Ellis*, 202 F.3d 1246, 1249 (9th Cir. 2000).  Only two other Courts of Appeals panels have analyzed a facial overbreadth challenge to subsection (iv) in precedential opinions.  In a briefly precedential opinion (before the opinion was vacated due to the party-presentation principle), a prior panel of this court held that subsection (iv) was facially overbroad.  *See Sineneng-Smith*, 910 F.3d at 485.  Most recently, the Tenth Circuit reached the same conclusion as the *Hansen* opinion, holding that subsection (iv) is facially overbroad.  *See United*

---

petition for a writ of certiorari is rarely granted when the asserted error consists of erroneous factual findings or the misapplication of a properly stated rule of law.").  Nor, in view of Hansen's fifteen remaining counts of conviction, and the fact that few convictions for deplorable conduct rely only on subsection (iv), *see infra* Part IV, is there "exceptional importance" to further review the two counts of conviction that were reversed under the facial overbreadth doctrine.  *Id.*

[3] The Government did not even cite *Tracy* in its Petition for Rehearing.

*States v. Hernandez-Calvillo*, No. 19-3210, __ F.4th __, 2022 WL 2709736 (10th Cir. July 13, 2022).[4]

## II.  Aiding, Abetting, and Solicitation

The main argument advanced by the Judge Bumatay dissent is that "encourages or induces" should instead be read to mean "aids, abets, or solicits."  The Judge Bumatay dissent, while saying that it argues for a textual interpretation, rewrites subsection (iv)'s plain language, changing "encourages or induces" to "aids, abets, or solicits."  This is unsound because immediately below subsection (iv), Congress expressly criminalized conduct that "aids or abets," showing beyond doubt that Congress knew how to include "aids or abets" when that is what it meant.  *See* § 1324(a)(1)(A)(v)(ii).  As explained in the *Hansen* opinion, "when Congress includes particular language in one section of a statute but omits it in another— let alone in the very next provision—this Court presume[s] that Congress intended a difference in meaning."  25 F.4th at 1108 (quoting *Loughrin v. United States*, 573 U.S. 351, 358 (2014)).

The Judge Bumatay dissent disregards the express language of subsection (iv) and the *Hansen* opinion's rationale.  The Judge Bumatay dissent stresses authorities that define words not in subsection (iv)—such as "aiding," "abetting," and "solicitation"—instead of authorities that define the words actually used in subsection (iv)—

[4] Not only is Judge Bumatay's dissent incorrect in stating that we lead a circuit split, as explained above, but also if we were to rehear the case and adopt the legal analysis of Judge Bumatay, that mistaken analysis would create a circuit split between Judge Bumatay's mistaken reasoning and the Tenth Circuit decision *Hernandez-Calvillo* which adopted reasoning parallel to that of *Hansen* in its current form.

"encourages or induces."**5**   Judge Bumatay's analysis is not persuasive: Defining "aiding, abetting, and solicitation" to sometimes include "encouraging or inducing" sheds no light on whether the words "encourages or induces" in subsection (iv) cover a substantial amount of protected conduct.  To determine properly whether "encourages or induces" cover a substantial amount of protected conduct, one should take the common-sense approach used in the opinion to define "encourages or induces" itself.  The Judge Bumatay dissent does not identify a single statute that uses only the words "encourages or induces" to mean "aids, abets, and solicits."

It is not surprising that some definitions of aiding, abetting, and solicitation cited by the Judge Bumatay dissent contain the words "encourage" or "induce," just as they contain other words that, if substituted for "encourages or induces" in subsection (iv), might also be facially overbroad (such as "requests," "hires," or "otherwise procured"). Further, the Judge Bumatay dissent's frequent references to statutes and authorities referencing "aiding," "abetting," and "solicitation" reinforce the point that when Congress intends to prohibit aiding, abetting, or soliciting, it includes those specific words in the statute.

The Judge Bumatay dissent erroneously claims that the opinion "blindly rel[ied] on lay-dictionary definitions to reach its overbroad interpretation of the law."  The Judge Bumatay dissent is off-base for two reasons.  First, to determine the meaning of "encourages" and "induces" in

---

**5** The Judge Bumatay dissent several times cites to *United States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007) (en banc), as part of this argument. *Lopez* too defines aiding and abetting, not encouraging or inducing. Further, the Government does not cite to *Lopez* in its briefing or Petition for Rehearing.

subsection (iv), the opinion relied on precedential cases which, in turn, used dictionary definitions to help determine the meaning of "encourages" or "induces" in the same or similar provisions. *See Hansen*, 25 F.4th at 1108 (citing to *United States v. Thum*, 749 F.3d 1143, 1147 (9th Cir. 2014), which defined "encourages" in subsection (iv), and *United States v. Rashkovski*, 301 F.3d 1133, 1136 (9th Cir. 2002), which defined "induce" in 18 U.S.C. § 2422(a)).    As discussed above, the Judge Bumatay dissent's proposed alternative methodology is flawed.  Second, the Supreme Court has often looked to dictionary definitions and the plain meaning of the text in a statute. *See, e.g.*, *HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2176–78 (2021) ("Where Congress does not furnish a definition of its own, we generally seek to afford a statutory term its ordinary or natural meaning." (internal quotation marks omitted)).    The Supreme Court has also often analyzed dictionary definitions. *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1140–41 (2018).

In its haste to equate subsection (iv) with an aiding and abetting statute, the Judge Bumatay dissent also overlooks several elements of aiding and abetting that are missing from any conceivably reasonable reading of subsection (iv).  As explained in the opinion, subsection (iv) would make a poor aiding and abetting statute because "aiding and abetting requires someone to have committed an underlying criminal offense and for the accused to have assisted or participated in the commission of that offense." *Hansen*, 25 F.4th at 1109 (citing *Thum*, 749 F.3d at 1148–49).    The language of subsection (iv) cannot be squared with these requirements.

I agree with the Judge Bumatay dissent that writing a statute is "best left to *elected* officials," not judges who seek

to rewrite the plain language of a statute. The legislature's writing of the statute is superior to that of a judge who may attempt to rewrite the statute *sub silentio*. It is for this reason that the opinion did not attempt, as the Judge Bumatay dissent does, to "rewrite [subsection (iv)] to conform it to constitutional requirements for doing so would constitute a serious invasion of the legislative domain and sharply diminish Congress's incentive to draft a narrowly tailored law in the first place." *Hansen*, 25 F.4th at 1110–11 (quoting *United States v. Stevens*, 559 U.S. 460, 481 (2010)). The opinion correctly does not try to salvage the flawed language of subsection (iv); Congress, not the judicial branch, has the duty to write statutes.

The Judge Bumatay dissent's lengthy exegesis on early English and colonial law about solicitation and aiding and abetting is interesting but largely irrelevant. Doubtless any of us can benefit in an appropriate case from pondering early nineteenth-century cases and the words and thoughts of William Blackstone, Sir Edward Coke, Lord Matthew Hale, and other treatise authors and legal scholars. But their general comments give little practical guidance here when we deal with the plain meaning of a simply phrased statute. The words "encourages or induces" are better assessed on their own with the traditional standards for statutory interpretation used in the *Hansen* opinion.

The Judge Bumatay dissent's belabored reasoning does, however, highlight two additional points that undermine the Judge Bumatay dissent's persuasive power. First, the Judge Bumatay dissent's approach is in direct conflict with the principle of Occam's razor, that the simpler approach is usually better. The *Hansen* opinion defines the words that are actually in subsection (iv). By contrast, the Judge Bumatay dissent advocates for discarding the words in

subsection (iv) and replacing them with words whose meaning it tries to derive from a scattering of definitions hundreds of years old. This overcomplicates the inquiry, as Judge Bumatay's dissent advocates rewriting subsection (iv). Second, the Judge Bumatay dissent's historical discourse is particularly inapt in the facial overbreadth context. "Facial overbreadth challenges are permitted because an overly broad statute may chill the speech of individuals, including those not before the court." *Hansen*, 25 F.4th at 1106 (citing *Massachusetts v. Oakes*, 491 U.S. 576, 581 (1989)). The examples of protected speech covered by subsection (iv) cited in the opinion, *see id.* at 1110, occur between countless individuals lacking the legal acumen or time to sift through dozens of sources hundreds of years old interpreting statutes with different language than subsection (iv). These individuals' speech will be chilled regardless of how a federal appellate judge might personally prefer to parse the words.

### III. Surplusage

The Judge Bumatay dissent makes much of one sentence in the opinion which references the canon against surplusage. Contrary to the Judge Bumatay dissent's contention, that sentence merely highlighted that Congress clearly knew how to write "aids and abets"—as it did immediately below subsection (iv)—and instead chose to say "encourages or induces" in subsection (iv).

### IV. Parades of Horribles

The Judge Bumatay dissent conjures up two fanciful parades of horribles that undermine its argument. First, the Judge Bumatay dissent opines that the opinion "may lead to the invalidation of other federal and state laws that use similar 'encourage' or 'induce' language." To support this

contention, the Judge Bumatay dissent cites a variety of federal and state laws. But, in fact, many of the cited statutes explicitly criminalize aiding, abetting, or soliciting. This leads to the conclusion that Congress and state legislative bodies know how to criminalize aiding, abetting, and solicitation—by actually criminalizing "aiding, abetting, and soliciting."

Second, the Judge Bumatay dissent suggests that the opinion will prevent the Government from prosecuting deplorable conduct that was previously criminalized under subsection (iv). As an initial matter, the opinion only invalidated subsection (iv) and the two convictions under it, while leaving intact the rest of the substantial criminal provisions in § 1324. In support of its contention, the Judge Bumatay dissent cites seven cases. These cases show just how hypothetical the Judge Bumatay dissent's alleged harm is: In all seven cases (as in *Hansen*), the defendants could also be convicted under other criminal statutes. *See United States v. Yoshida*, 303 F.3d 1145, 1149 (9th Cir. 2002) (defendant also convicted under 8 U.S.C. § 1324(a)(2)(B)(ii)); *United States v. Lozada*, 742 F. App'x 451, 452 (11th Cir. 2018) (unpublished) (also affirming defendant's conviction for defrauding the United States under 18 U.S.C. § 371); *United States v. Pena*, 418 F. App'x 335, 337 (5th Cir. 2011) (unpublished) (defendants also convicted of money laundering under 18 U.S.C. § 1956(a)(1)(B)(i)); *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1299−1300 (11th Cir. 2010) (noting the sufficiency of allegations to state a violation under § 1324(a)(1)(A)(iii)); *United States v. Lopez*, 590 F.3d 1238, 1243 (11th Cir. 2009) (also affirming conviction under 8 U.S.C. § 1327); *Tracy*, 456 F. App'x at 268 (also affirming conviction under 18 U.S.C. § 1542); *United States v. One 1989 Mercedes Benz*, 971 F. Supp. 124, 129 (W.D.N.Y. 1997) (denying

defendant's motion for summary judgment and granting government's motion for summary judgment also under 8 U.S.C. § 1325(a)); *see also Hernandez-Calvillo*, __ F.4th __, 2022 WL 2709736 at *8–9 (noting the Government's failure to identify any case in which subsection (iv) is the only available statutory provision to punish deplorable conduct). The Judge Bumatay dissent therefore makes clear that there are very few cases in which a defendant committing deplorable conduct can only be convicted under subsection (iv).

## V. Constitutional Avoidance

The Judge Bumatay dissent argues that it was "baffling that [the opinion] decided to give the canon [of constitutional avoidance] short shrift here." The Judge Bumatay dissent then contends that the opinion's "only response [to the canon of constitutional avoidance argument] is that 'the plain meaning of subsection (iv) does not permit the application of the constitutional avoidance canon.'" This misreads the opinion. The opinion conducted a thorough analysis of what "encourages or induces" meant within the context of § 1324, subsection (iv)'s plainly legitimate sweep, and the amount of protected speech in relation to subsection (iv)'s plainly legitimate sweep. *See Hansen*, 25 F.4th at 1107–10. Other than disagreeing with that analysis and calling it "baffling," the Judge Bumatay dissent does not identify how the opinion gave the constitutional avoidance argument "short shrift." Instead, the opinion noted "that courts 'construe[ ] [statutes] to avoid serious constitutional doubts,' [and the canon of constitutional avoidance] only applies when a statute 'is readily susceptible to such a construction.'" *Hansen*, 25 F.4th at 1110 (quoting *Stevens*, 559 U.S. at 481). Here, there was no reasonable and plausible interpretation of

subsection (iv) that would avoid the facial overbreadth problem on which the opinion ruled.

## VI.  The Facial Overbreadth Doctrine

Perhaps most offensive to Supreme Court case law, the Judge Bumatay dissent takes issue with the facial overbreadth doctrine, repeatedly referring to the facial overbreadth doctrine as a "nuclear option."  But the Supreme Court's law on facial overbreadth was not pulled like a rabbit out of a hat.  The *Hansen* opinion relied on the Supreme Court's own precedent.  *See, e.g.*, *Stevens*, 559 U.S. at 472–73; *United States v. Williams*, 553 U.S. 285, 292–93 (2008); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002); *Oakes*, 491 U.S. at 581; *City of Houston v. Hill*, 482 U.S. 451, 458–59 (1987); *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800–01 (1984).  The Supreme Court, moreover, has very recently continued to rely on the facial overbreadth doctrine that the Judge Bumatay dissent so disfavors.  *See Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021).

In addition, not only the Ninth Circuit, but other federal circuits as well, have recognized and respected the Supreme Court's doctrine on facial overbreadth.[6]  As the opinion in *Hansen* correctly recognized and explained, facial

---

[6] *See, e.g., Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 153 (2d Cir. 2000); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 214–18 (3d Cir. 2001); *Liverman v. City of Petersburg*, 844 F.3d 400, 409 (4th Cir. 2016); *Speet v. Schuette*, 726 F.3d 867, 879–80 (6th Cir. 2013); *Bell v. Keating*, 697 F.3d 445, 455–61 (7th Cir. 2012); *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1157–59 (8th Cir. 2014); *United States v. Rundo*, 990 F.3d 709, 717–19 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 865 (2022); *FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1301–04 (11th Cir. 2017).

overbreadth is "strong medicine." *See* 25 F.4th at 1111 (citing *United States v. Williams*, 553 U.S. 285, 293 (2008)). On occasion, strong medicine is just what is needed. It is not a "nuclear option" causing unspeakable damage without any constraint. It is a Supreme Court doctrine that has its place in protecting First Amendment freedoms.

The Judge Bumatay dissent relies primarily on a concurrence by Justice Thomas that no other justice joined. The Judge Bumatay dissent argues that the facial overbreadth doctrine is "suspect" and on a "shaky foundation." To state the obvious, a concurrence by a single justice does not make precedent for the Supreme Court or for inferior courts like the Ninth Circuit. Instead, the *Hansen* opinion properly looked to recent cases in which the Supreme Court applied the facial overbreadth doctrine. *See Hansen*, 25 F.4th at 1106–10 (citing *Stevens*, 559 U.S. 460; *Williams*, 553 U.S. 285; *Free Speech Coal.*, 535 U.S. 234; *Oakes*, 491 U.S. 576; *Hill*, 482 U.S. 451; *Taxpayers for Vincent*, 466 U.S. 789).

Of course, the Supreme Court is free to change its precedent, and if it establishes a new rule, it will be followed by the Ninth Circuit. But, unless and until the Supreme Court changes its law (and no change has as yet even been foreshadowed by a precedential Supreme Court decision), this court is bound to follow the Supreme Court's current precedent, regardless of any Ninth Circuit judge's personal view about the correctness of the facial overbreadth doctrine. Ninth Circuit judges are not empowered to anticipatorily overrule a Supreme Court doctrine. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("We reaffirm that '[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly

controls, leaving to this Court the prerogative of overruling its own decisions.'" (quoting *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989))). Judges on this court cannot discard the Supreme Court's doctrine on facial overbreadth merely because they disfavor its application in any particular case.

---

BUMATAY, Circuit Judge, joined by CALLAHAN, IKUTA, R. NELSON, LEE, and VANDYKE, Circuit Judges; BENNETT, Circuit Judge, in all except Part III-A, and BRESS, Circuit Judge, in Parts I, II, and III-B, dissenting from the denial of rehearing en banc:

Today, our court invalidates a 70-year-old alien-smuggling law—8 U.S.C. § 1324(a)(1)(A)(iv)—which prohibits "encourag[ing]" or "induc[ing]" aliens to illegally enter the country. *See United States v. Hansen*, 25 F.4th 1103 (9th Cir. 2022). We do so under the banner of First Amendment protection. Freedom of speech is a core principle in our constitutional republic, but § 1324(a)(1)(A)(iv) is no threat to that guarantee. Based on text, history, and structure, the provision prohibits only criminal solicitation and aiding and abetting. But instead of following the statute's clear meaning, we contort its scope and then imagine ways the misconstrued law might cover protected speech. We then wipe away the whole provision under the overbreadth doctrine—the nuclear option of First Amendment jurisprudence.

If this sounds familiar, it is. Our court took a similar approach a few years ago in *United States v. Sineneng-Smith*, 910 F.3d 461 (9th Cir. 2018). In that case, no party asked our court to review the alien-smuggling law on overbreadth grounds. But we took it upon ourselves to pick lawyers to

argue that position—and just like that, we held the statute unconstitutional.

The Supreme Court quickly rebuked our handiwork and *unanimously* vacated our decision. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1582 (2020). True, the Court was mostly concerned with our egregious violation of the party-presentation principle in that case. But Justice Ginsburg, writing for the full Court, made clear that the Justices were also unhappy with our substantive holding:

> [T]he [Ninth Circuit] panel projected that § 1324(a)(1)(A)(iv) might cover a wide swath of protected speech, including political advocacy, legal advice, even a grandmother's plea to her alien grandchild to remain in the United States. *Nevermind* that Sineneng-Smith's counsel had presented a contrary theory of the case in the District Court, and that this Court has repeatedly warned that invalidation for [First Amendment] overbreadth is strong medicine that is not to be casually employed.

*Id.* at 1581 (simplified) (emphasis added).

Rather than take the hint, we again strike down the same statutory provision. *Nevermind* that the law is perfectly consistent with the First Amendment under proper principles of statutory interpretation. *Nevermind* that the canon of constitutional avoidance commands us not to construe a statute in breach of the Constitution when we don't have to. And *nevermind* that the Court disfavors the invalidation of statutes under the overbreadth doctrine.

\*

Helaman Hansen operated a fraudulent adult adoption program that targeted undocumented aliens. Hansen preyed on their hopes by falsely telling them that they could become U.S. citizens simply by being adopted. For these false hopes, Hansen charged as much as $10,000. Hansen defrauded almost 500 aliens, and, of course, no alien became a U.S. citizen. For this scheme, the government charged Hansen with multiple offenses—including two counts of encouraging or inducing an alien for financial gain under § 1324(a)(1)(A)(iv) and (B)(i). A jury convicted him of all counts.

On appeal, we took the extraordinary step of holding § 1324(a)(1)(A)(iv) unconstitutional under the First Amendment's overbreadth doctrine. *Hansen*, 25 F.4th at 1111. In doing so, we gave "encourage" and "induce" a broad meaning untethered from the criminal law context and hypothesized that the law would chill "a vast amount of protected speech related to immigration." *Id.* at 1107. To justify that conclusion, we conjured up a parade of horribles theoretically prosecutable under the law, such as "advising an undocumented immigrant about available social services" or to "take shelter during a natural disaster." *Id.* at 1110.

Just as we were wrong in *Sineneng-Smith*, we are wrong now. For centuries, the terms "encouraging" and "inducing" have been recognized in criminal law as referring to complicity in the commission of a crime. So under established and settled meaning, § 1324(a)(1)(A)(iv) is just an ordinary criminal solicitation and aiding-and-abetting provision. Indeed, in prior versions of the alien-smuggling law, Congress used the terms synonymously with "soliciting" and "assisting" another to commit crime. And, of course, speech that solicits or aids illegal conduct is "categorically" unprotected by the First Amendment. *See*

*United States v. Williams*, 553 U.S. 285, 297 (2008). Reading the law in its proper light thus eliminates the parade of horribles created by our court and removes any tension with the First Amendment.

Instead of following this straightforward interpretation, our court makes mistake after mistake to hold § 1324(a)(1)(A)(iv) unconstitutional.

First, we misread the statute by blindly relying on lay-dictionary definitions to reach an overly broad interpretation of the law. Instead, we should have looked to the settled meaning of the statutory terms. As the Court recently reaffirmed, "[w]here Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it." *George v. McDonough*, 142 S. Ct. 1953, 1959 (2022) (simplified). If we had followed this established principle, we would have understood that § 1324(a)(1)(A)(iv) is an ordinary solicitation and aiding-and-abetting statute and poses no free-speech concerns.

Second, we improperly invoked the surplusage canon to disregard § 1324(a)(1)(A)(iv) as a solicitation and aiding-and-abetting statute. To begin, we seemingly conflated the two concepts and completely ignored solicitation as a distinct offense. If we had considered solicitation, then we would have found no surplusage because no other provision of § 1324 outlaws solicitation. We also misapplied the surplusage canon to erase aiding-and-abetting liability from the law. We claimed that because another aiding-and-abetting provision exists in § 1324(a)(1)(A)(v)(II), subsection (iv) could not also prohibit aiding and abetting. *See Hansen*, 25 F.4th at 1109 ("Interpreting subsection (iv) as different from aiding and abetting also avoids any related concerns that either it or § 1324(a)(1)(A)(v)(II) is superfluous."). But that's wrong. Subsection (iv) prohibits

aiding and abetting a specific thing that no other provision of § 1324(a)(1)(A) targets. Specifically, subsection (iv) prohibits the aiding and abetting of an *alien* "com[ing] to, enter[ing], or resid[ing] in the United States" in violation of law, while subsection (v)(II) addresses aiding or abetting a criminal *principal* "bring[ing]," "transport[ing]," or "harbor[ing]" aliens illegally in the United States. 8 U.S.C. § 1324(a)(1)(A)(i)–(iv), (v)(II). We thus have no surplusage problem here.

Third, we failed to respect the constitutional avoidance canon. Even if exhausting statutory tools doesn't clearly show that the law prohibits solicitation and aiding and abetting, at a minimum, the constitutional avoidance canon commands that we construe it that way. Ignoring this principle of avoidance undermines the separation of powers and aggrandizes our role as judges. In fact, we seemingly invent the opposite principle—let's call it the "constitutional collision canon"—*stretching* the law to ensure that it violates the Constitution. Such a canon should be soundly rejected.

And finally, even if the provision could conceivably reach some protected speech, we still shouldn't have pulled the trigger on overbreadth invalidation—a remedy of last resort. There was no reason to cavalierly strike down the statute, especially given its long history and vast legitimate sweep.

This case was an obvious candidate for en banc review.

We now lead a circuit split. *See United States v. Tracy*, 456 F. App'x 267, 272 (4th Cir. 2011) (unpublished) ("Although there may be some instances in which we might find that [8 U.S.C. § 1324(a)(1)(A)(iv)] chills protected speech, we are unconvinced that the [provision] prohibits a substantial amount of such speech."); *United States v.*

*Hernandez-Calvillo*, — F.4th —, 2022 WL 2709736, at *11 (10th Cir. 2022) ("[W]e hold that [8 U.S.C. § 1324(a)(1)(A)(iv)] is substantially overbroad under the First Amendment.").

And our decision may lead to the invalidation of other federal and state laws that use similar "encourage" or "induce" language. *See, e.g.*, 18 U.S.C. § 2(a) ("aids, abets, counsels, commands, *induces* or procures [the commission of an offense against the United States]"); 18 U.S.C. § 373(a) ("[w]hoever . . . solicits, commands, *induces*, or otherwise endeavors to persuade" another to engage in a crime of violence); Haw. Rev. Stat. Ann. § 705-510(1) ("commands, *encourages*, or requests"); Mont. Code Ann. § 45-4-101(1) ("commands, *encourages*, or facilitates"); Idaho Code Ann. § 18-204 ("aid and abet . . . advise[] and *encourage*[]"); Nev. Rev. Stat. Ann. § 195.020 ("aids or abets . . . , counsels, *encourages*, hires, commands, *induces* or otherwise procures") (emphases added).

Indeed, this case is already wreaking havoc in our court. *Compare Marquez-Reyes v. Garland*, 36 F.4th 1195, 1201–07 (9th Cir. 2022) (explaining that *Hansen* doesn't apply to 8 U.S.C. § 1182(a)(6)(E)(i), which affects any alien who "knowingly has encouraged, induced, assisted, abetted, or aided any other alien" to enter the country illegally), *with id.* at 1209–13 (Berzon, J., dissenting) (arguing that *Hansen* does apply).

For these reasons, I respectfully dissent from the denial of rehearing en banc.

**I.**

At its core, this case concerns the scope of what 8 U.S.C. § 1324(a)(1)(A)(iv) criminalizes.[1]   If the provision is a straightforward solicitation and aiding-and-abetting statute (as I will show), we have little free-speech concerns.  That's because "speech integral to criminal conduct" is a categorical exception to the First Amendment. *United States v. Stevens*, 559 U.S. 460, 468–69 (2010).  It's thus important to understand the common law concepts of solicitation and aiding and abetting.  So I begin there.

Solicitation is a "well-established (and distinct) type of inchoate crime." *Cortes-Maldonado v. Barr*, 978 F.3d 643, 651 (9th Cir. 2020).  It prohibits the act of trying to persuade another to commit an unlawful offense with intent for the crime to be committed. *See* Wayne R. LaFave, 2 Subst. Crim. L. § 11.1 (3d ed. 2017).  With solicitation, the crime is complete the moment a person "entice[s], advise[s], incite[s], order[s,] or otherwise encourage[s]" another to commit the underlying offense. *Id.*  The offense solicited need not be completed. *Id.*

Before the 1800s, it was generally accepted that solicitation of perjury, bribery, and forgery were crimes. *Id.* § 11.1(a) (citing *Rex v. Johnson*, 80 Eng. Rep. 753 (1679) and *Rex v. Vaughan*, 98 Eng. Rep. 308 (1769)).  But it wasn't until the turn of the 19th century, that solicitation as a general crime was recognized by English courts. *See Rex v. Higgins*, 102 Eng. Rep. 209 (1801).  There, a man was charged with

---

[1] The provision provides that "[a]ny person who—encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law . . . shall be punished." 8 U.S.C. § 1324(a)(1)(A)(iv).

soliciting a servant to steal his master's goods. *Id.* Even though the servant didn't carry out the theft, the court held that the solicitation was its own crime. *Id.* Since *Higgins*, solicitation has been accepted as a common law offense in both the United States and England. LaFave, *supra*, § 11.1(a). As an early state court held, "[t]he very act of advising to the commission of a crime is of itself unlawful." *Commonwealth v. Bowen*, 13 Mass. 356, 359 (1816).

Aiding and abetting, or more succinctly "facilitation," resembles solicitation, but it requires the commission of a crime. At common law, "a person may be responsible for a crime he has not personally carried out if he helps another to complete its commission." *Rosemond v. United States*, 572 U.S. 65, 70 (2014). For aiding-and-abetting liability to attach, a person must, in part, "assist[] or participate[] in the commission of the underlying substantive offense," and "someone [else] [must have] committed the underlying substantive offense." *United States v. Thum*, 749 F.3d 1143, 1148–49 (9th Cir. 2014) (simplified). It's a broad form of criminal liability and "comprehends all assistance rendered by words, acts, encouragement, support, or presence." *Reves v. Ernst & Young*, 507 U.S. 170, 178 (1993) (simplified).

Historically, the common law divided aiders and abettors into two buckets. First were second-degree principals, who were "aiders and abettors present at the scene of the crime." *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 189 (2007). Second were accessories before the fact, who were "aiders and abettors who helped the principal before the basic criminal event took place." *Id.* As a seminal criminal treatise explains, accessory-before-the-fact liability was described as "order[ing], counsel[ing], encourag[ing], or otherwise aid[ing] and abet[ting] another to commit a felony and who [was] not present at the commission of the offense."

LaFave, *supra*, § 13.1(c).   Today, we focus less on this distinction and consider "aiders and abettors who fall into the [two] categories" as simply criminal facilitators.   *See Duenas-Alvarez*, 549 U.S. at 189.

Speech that creates criminal liability under either solicitation or aiding and abetting is unprotected.   The First Amendment establishes that "Congress shall make no law . . . abridging the freedom of speech."   U.S. Const. amend. I. But "speech integral to criminal conduct" is one of the "historic and traditional categories" of excepted, punishable speech.   *Stevens*, 559 U.S. at 468 (citing *Simon & Shuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 127 (1991); *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949)).   And speech that constitutes criminal solicitation or facilitation falls within this exception.   *See Williams*, 553 U.S. at 297 (holding that solicitation is "categorically excluded from First Amendment protection"); *Rosemond*, 572 U.S. at 73 (approving of the federal aiding-and-abetting statute, which "comprehends all assistance rendered by words, acts, encouragement, support, or presence" (simplified)); *see generally* Eugene Volokh, The "Speech Integral to Criminal Conduct" Exception, 101 Cornell L. Rev. 981 (2016).

With this understanding of first principles, let's turn to § 1324(a)(1)(A)(iv).

## II.

Section 1324(a)(1)(A)(iv) punishes any person who "encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry or residence is or will be in violation of law."   In addition, "in the case of a violation . . . in which the offense was done for the purpose of commercial

advantage or private financial gain," the person will be fined or imprisoned for up to 10 years, or both. 8 U.S.C. § 1324(a)(1)(B)(i).

When Congress used the terms "encourage" and "induce" in § 1324(a)(1)(A)(iv), it was not legislating in a vacuum. Rather, it enacted the provision against the backdrop of those words having settled meaning in the criminal law. For hundreds of years, both terms were historically bound up with liability for criminal complicity. So it's clear Congress was targeting those types of crimes— solicitation (when the underlying crime isn't committed) and facilitation (when the underlying crime is committed)— when enacting § 1324(a)(1)(A)(iv). The text, history, and structure of § 1324 confirms this.

## A.

First, some history. From before our Founding, to the late 19th century, to the modern era, crimes involving solicitation and facilitation were defined with terms tantamount to "encourage" and "induce."

Starting back in the 17th century, Edward Coke wrote that accessory-before-the-fact liability attached to "all those that incite, procure, set on, or stir up any other to do the fact, and are not present when the fact is done." 2 Edward Coke, Institutes of the Laws of England 182 (6th ed. 1681). He also said that it applies to "all persons counselling, abetting, plotting, assenting, consenting, and encouraging to do the act, and are not present when the act is done." *Id.*

Closer to our Founding, William Blackstone described accessory-before-the-fact liability as "procur[ing], counsel[ing], or command[ing] another to commit a crime" and explained that "[i]f A then advises B to kill another, and

B does it in the absence of A, now B is principal, and A is accessory in the murder." 4 William Blackstone, Commentaries on the Laws of England 36–37 (1769); *see also* 1 Matthew Hale, The History of the Pleas of the Crown 615 (1736) (noting that to "procure, counsel, command, or abet another to commit a felony" while being absent from the commission of the crime creates accessory-before-the-fact liability).

This common law understanding persisted throughout the 19th century. For example, an 1816 state court approved of a charge against a prison inmate for "induc[ing], encourag[ing], and fix[ing] the intention, and ultimately procur[ing] the perpetration" of the suicide of another inmate, who was set for execution. *Bowen*, 13 Mass. at 358–60. And prominent legal scholar Francis Wharton explained that "[i]t has been settled in England that if a man encourages another to murder himself, and he is present abetting him while he does so, such man is guilty of murder as a principal." Francis Wharton, A Treatise on the Criminal Law of the United States 230 (1846).

Further, at that time, English laws outlawing criminal encouragements and inducements were well established. For example, an English law punished "any person [who] entice[d] or encourage[d] any artificer employed in printing calicoes, cottons, muslins, or linens, to leave the kingdom." 4 Jacob Giles, The Law-Dictionary: Explaining the Rise, Progress, and Present State, of the English Law 235 (1811) (emphasis omitted). Another law provided that "[a]n attempt to induce a man to advise the king under the influence of a bribe, is criminal, though never carried into execution." 1 Giles, *supra*, at 370.

Early legal dictionaries also used variants of "encourage" and "induce" to describe criminal solicitation and aiding and abetting. Consider these definitions from the 1790s to the 1880s:

- 1 Richard Burn, A New Law Dictionary 4, 7 (1792):

  - *Accessary before the fact*: One who "procure[s], counsel[s], command[s], or abet[s] another to commit a felony."

  - *Abet*: "[I]s to stir up or incite, encourage or set on; one who promotes or procures a crime. Abettors of murder, are such as command, procure, or counsel others to commit a murder[.]" (emphasis deleted).

- 1 Giles, *supra*, at 14:

  - *To Abet*: "In our law signifies to encourage or set on; the substantive abetment is used for an encouraging or instigation. An abettor is an instigator or setter on; one that promotes or procures a crime." (emphasis deleted).

- 1 John Bouvier, Law Dictionary Adapted to the Constitution and Laws of the United States of America, and of the Several States of the American Union 30–31 (1839):

  - *To Abet*: "[C]rim. law. To encourage or set another on to commit a crime[.] To abet another to commit a murder, is to command, procure, or counsel him to commit it."

- *Abettor*: "[I]s one who encourages or incites, encourages or sets another on to commit a crime."

- William Cochran, The Students' Law Lexicon A Dictionary of Legal Words and Phrases 2, 142 (1888):

  - *Abet*: "[T]o aid, encourage, or incite another to commit a crime."

  - *Incite*: "[T]o stimulate or induce a person to commit a crime. This is a misdemeanor, whether the crime be committed or not."

- Henry Campbell Black, A Dictionary of Law 6, 419, 617 (1891):

  - *Encourage*: "In criminal law. To instigate; to incite to action; to give courage to; to inspirit; to embolden; to raise confidence; to make confident. See Aid."

  - *Abet*: "In criminal law. To encourage, incite, or set another on to commit a crime. To abet another to commit a murder is to command, procure, or counsel him to commit it."

  - *Inducement*: "In criminal evidence. Motive; that which leads or tempts to the commission of crime."

Moving forward to the 20th century, the same terminology was used to define solicitation and facilitation. In *Fox v. Washington*, for example, the Supreme Court recognized that a state statute prohibiting the publication of

material "advocating, encouraging or inciting . . . which shall tend to encourage or advocate disrespect for law" was a common law solicitation or facilitation provision. 236 U.S. 273, 275 (1915) (simplified); *see also id.* at 277 (recognizing that "encouragements . . . directed to a particular persons' conduct, generally would make him who uttered them guilty of a misdemeanor if not an accomplice or a principle in the crime encouraged"). Justice Holmes understood the statute as "encouraging an actual breach of law," which is "an overt breach and technically criminal act." *Id.* at 277. Under that narrow construction, Justice Holmes thought the law could not be used to "prevent publications merely because they tend to produce unfavorable opinions of a particular statute or of law in general." *Id.* And so the law was no "unjustifiable restriction of liberty" and comported with the freedom of speech. *Id.*; *see also Cox v. Louisiana*, 379 U.S. 559, 563 (1965) (explaining the familiar principle that "[a] man may be punished for encouraging the commission of a crime").

And more recently, courts have used "encouraging" and "inducing" to define criminal complicity. For example, in *Williams*, the Court equated "induce" with "solicit." 553 U.S. at 294. There, the Court said that the solicitation statute at issue "penalizes speech that accompanies or seeks to induce a transfer of child pornography." *Id.* Our court sitting en banc has also understood this settled meaning. In *United States v. Lopez*, we explained that an abettor "commands, counsels or otherwise encourages the perpetrator to commit the crime," and a facilitator "aid[s], counsel[s], command[s], induce[s] or procure[s] [the principal] to commit each element" of the crime. 484 F.3d 1186, 1199 (9th Cir. 2007) (en banc) (simplified).

Modern dictionaries also recognize the established meaning of the terms in the criminal context.  In legal dictionaries, "abet" has been defined as "[t]o encourage, incite, or set another on to commit a crime."  Black's Law Dictionary (4th ed. 1951).  That dictionary also used the term synonymously with "encourag[ing], counsel[ing], induc[ing], or assist[ing]" the commission of crime.  *Id.*  The 2019 edition of Black's retains a similar meaning for "abet": "[t]o aid, encourage, or assist (someone), esp. in the commission of a crime."  Black's Law Dictionary (11th ed. 2019).  And it defines criminal inducement as "entic[ing] or urging another person to commit a crime."  *Id.*  Even lay dictionaries understand the words as terms of art to define criminal complicity.  *See, e.g.*, Webster's Third New International Dictionary 3 (2002) (defining "abet" as to "incite, encourage, instigate, or countenance," as in "the commission of a crime"); Webster's New International Dictionary 4 (2d ed. 1958) (same).

Longstanding federal and state statutes also employ "encourage," "induce," and other variants to define criminal solicitation and aiding and abetting.  For example, one federal statute punishes as solicitation "[w]hoever . . . solicits, commands, induces, or otherwise endeavors to persuade" another to engage in a crime of violence.  18 U.S.C. § 373(a).  Another punishes as aiding and abetting a person who "aids, abets, counsels, commands, induces or procures [the commission of an offense against the United States]."  18 U.S.C. § 2(a).  The Model Penal Code defines solicitation as "command[ing], encourag[ing], or request[ing] another person to engage in specific [unlawful] conduct."  Model Penal Code § 5.02(1) (1985).  And many

state statutes defining solicitation[2] and accessory liability[3] look the same.

## B.

With this understanding of the well-settled meaning of "encourage" and "induce," I return to the statutory provision at issue: encouraging and inducing an alien to illegally enter the country under 8 U.S.C. § 1324(a)(1)(A)(iv). Its statutory history confirms Congress's goal to prohibit criminal solicitation and facilitation. And that's how we should have interpreted the provision.

### i.

In 1885, Congress enacted the statute that would later become 8 U.S.C. § 1324. That statute criminalized "knowingly assisting, encouraging or soliciting the migration or importation of any alien or aliens, foreigner or foreigners, into the United States." Alien Contract Labor

---

[2] *See, e.g.*, Ariz. Rev. Stat. Ann. § 13-1002(A) ("commands, encourages, requests or solicits"); Idaho Code Ann. § 18-2001 ("solicits, importunes, commands, encourages or requests"); Haw. Rev. Stat. Ann. § 705-510(1) ("commands, encourages, or requests"); Mont. Code Ann. § 45-4-101(1) ("commands, encourages, or facilitates"); Wyo. Stat. Ann. § 6-1-302(a) ("commands, encourages or facilitates"); Colo. Rev. Stat. § 18-2-301(1) ("commands, induces, entreats, or otherwise attempts to persuade another person"); Tex. Penal Code Ann. § 15.03(a) ("requests, commands, or attempts to induce").

[3] *See, e.g.*, Idaho Code Ann. § 18-204 ("aid and abet . . . advise[] and encourage[]"); Nev. Rev. Stat. Ann. § 195.020 ("aids and abets [or] counsels, encourages, hires, commands, induces or otherwise procures"); Colo. Rev. Stat § 18-1-603 ("aids, abets, advises, or encourages"); Tex. Penal Code Ann. § 7.02(a)(2) ("solicits, encourages, directs, aids, or attempts to aid"); Utah Code Ann. § 76-2-202 ("solicits, requests, commands, encourages, or intentionally aids").

Law, ch. 164, § 3, 23 Stat. 332, 333 (1885). Thus, from the beginning, we know that Congress intended "encouraging" to take on a similar meaning as "assisting" or "soliciting" illegality. That's because "a word is given more precise content by the neighboring words with which it is associated." *Williams*, 553 U.S. at 294 (describing the "commonsense canon of *noscitur a sociis*"); *see also id.* at 294–95 (construing "promotes" and "presents" to mean "solicits" in a statute punishing any person who "advertises, promotes, presents, distributes, or solicits" child pornography). Indeed, the Court understood that the statute "punish[ed] those who assist in introducing, or attempting to introduce, aliens in violation of [Congress's] prohibition." *Lees v. United States*, 150 U.S. 476, 480 (1893).

Congress's use of "encouragement" to refer to solicitation and facilitation remained consistent through 1903 and 1907 updates. For example, the 1903 version of the law made it unlawful to (1) "prepay the transportation or in any way to assist or encourage the importation or migration of any alien into the United States"; (2) "assist or encourage the importation or migration of any alien by a promise of employment through advertisements"; (3) "directly or through agents, either by writing, printing, or oral representations, solicit, invite, or encourage the immigration of any aliens into the United States"; and (4) "[t]o knowingly aid[], advise[], or encourage[] any such person to apply for or to secure [unlawful] naturalization." Immigration Act of 1903, ch. 1012, § 5, 32 Stat. 1213, 1214–15, 1222. Again, Congress used "encourage" in the same breath as criminal "assist[ance]" and "solicit[ation]"— demonstrating their equivalence.

The 1907 version was similar. It made it unlawful to (1) "prepay the transportation or in any way to assist or

encourage the importation or migration of any contract laborer or contract laborers into the United States"; (2) "assist or encourage the importation or migration of any alien by promise of employment through advertisements printed and published in any foreign country"; and (3) "either by writing, printing, or oral representation, solicit, invite, or encourage the immigration of any aliens into the United States." Immigration Act of 1907, ch. 1134, § 5, 34 Stat. 898, 900.

With the 1917 iteration, Congress added "inducement" as another variant of the soliciting and assisting language. It updated the statute to make it unlawful to (1) "in any way to induce, assist, encourage, or solicit . . . the importation or migration of any contract laborer or contract laborers into the United States"; and (2) "induce, assist, encourage, or solicit . . . any alien to come into the United States by promise of employment through advertisements." Immigration Act of 1917, ch. 29, § 5, 39 Stat. 874, 879. The *noscitur* canon makes clear that "induce" also takes on a similar meaning to criminal "asssist[ance]" and "solicit[ation]." And there's certainly no evidence that Congress intended to encompass non-criminal conduct by the inclusion of the word "inducement."

Indeed, the Court also interpreted "induce" in the 1917 law to mean the solicitation or facilitation of a crime. *See United States v. Hoy*, 330 U.S. 724 (1947). There, a man was charged for "writ[ing] a letter to certain persons living in Mexico to induce them to come to the United States to work for him." *Id.* at 725. In the letter, he assured the aliens that he would "arrange everything," and get them out on bond if they were caught by immigration officials. *Id.* In analyzing the case, the Court described the 1917 law's solicitation and facilitation provision as a "prohibition

against employers inducing laborers to enter the country."
*Id.* at 731.

In 1952, Congress streamlined its language in enacting
the modern-day § 1324 statute. The new version made it
unlawful to "willfully or knowingly encourage[] or induce[],
either directly or indirectly, the entry into the United States
of—any alien . . . not duly admitted by an immigration
officer or not lawfully entitled to enter or reside within the
United States[.]" Immigration and Nationality Act, ch. 477,
66 Stat. 163, 229 (1952) (8 U.S.C. § 1101 *et seq.*). Once
again, there's nothing to suggest that Congress altered the
meaning of the immigration statute by reducing the number
of operative verbs to two.

And a few decades later, Congress made final tweaks to
the provision—giving the statute its current form. In 1986,
Congress amended the law to punish a person who
"encourages or induces an alien to come to, enter, or reside
in the United States, knowing or in reckless disregard of the
fact that such coming to, entry or residence is or will be in
violation of law." Immigration Reform and Control Act,
Pub. L. No. 99-603, 100 Stat. 3359 (1986) (current version
at 8 U.S.C. § 1324(a)(1)(A)(iv)).

Then in 1996, Congress added enhanced penalties for
conduct undertaken for the "purpose of commercial
advantage or private financial gain." Illegal Immigration
Reform and Immigrant Responsibility Act of 1996, Pub. L.
No. 104-208, div. C Tit. II, Subtit. A., § 203(a), (b), 110 Stat.
3009, 3009–565 (1996) (codified as 8 U.SC.
§ 1324(a)(1)(B)(i)). At the same time, Congress added
punishments for conspiracy and for aiding or abetting the
other provisions of § 1324. *Id.* (codified as 8 U.S.C.
§ 1324(a)(1)(A)(v)(I)–(II)).

With that overview, we can now interpret the meaning of § 1324(a)(1)(A)(iv).

## ii.

When it comes to statutory interpretation, we must always be mindful of "the specific context in which the language is used, and the broader context of the statute as a whole." *Yates v. United States*, 574 U.S. 528, 537 (2015) (simplified). And while we often look to the ordinary meaning of the statute, sometimes looking at dictionary definitions in isolation can lead us astray. *See, e.g.*, *Bloate v. United States*, 559 U.S. 196, 205 n.9 (2010). As we've recently said, "when a phrase is obviously transplanted from another legal source," such as other legislation or the common law, "it brings the old soil with it." *United States v. Randall*, 34 F.4th 867, 875 (9th Cir. 2022) (simplified). In other words, when Congress adopts a phrase with a settled meaning "absent some indication to the contrary, we presume that Congress chose to give the phrase its established meaning." *Id.* Indeed, the Court recently explained that "[t]he point of the old-soil principle is that when Congress employs a term of art, that usage itself suffices to adopt the cluster of ideas that were attached to each borrowed word." *McDonough*, 142 S. Ct. at 1963 (simplified). Here we have buckets of soil to understand Congress's meaning.

From before the Founding until today, both in statutes and in common law, the terms "encourage" and "induce" have been used to define solicitation and aiding and abetting. Congress knew that when it began passing criminal immigration laws in 1885. So when interpreting § 1324(a)(1)(A)(iv)'s prohibition of "encourag[ing] or induc[ing] an alien to [illegally] come to, enter, or reside in the United States," our duty is to apply settled meaning.

Thus, the best reading of the provision is that it prohibits the solicitation and facilitation of the underlying offense—coming to, entering, or residing in the country in violation of law. In other words, subsection (iv) is just an ordinary solicitation and facilitation provision.

Once subsection (iv) is understood as a solicitation and facilitation statute, to be charged, any words of encouragement or inducement must be tied to the speaker's "purpose of promoting or facilitating [the offense's] commission." Model Penal Code § 5.02(1). That's because those crimes "require as one element the *mens rea* to achieve the commission of a particular crime." *United States v. Vidal*, 504 F.3d 1072, 1079 (9th Cir. 2007) (en banc); *see also* Charles E. Torcia, Wharton's Criminal Law § 38 (15th ed. 1993) (describing an accomplice as one who "with the intent to promote or facilitate the commission of the crime, . . . solicits, requests, or commands the other person to commit it, or aids the other person in planning or committing it" and noting that "[t]he absence of mens rea precludes one from being an accomplice").

And even if those crimes encompass some speech, speech "that is intended to induce or commence illegal activities" is "undeserving of First Amendment protection." *Williams*, 553 U.S. at 298. As the Court said back in 1893, "[i]f congress has power to exclude [certain aliens], as . . . it unquestionably has, it has the power to punish any who assist in their introduction" into the country. *Lees*, 150 U.S. at 480.

Contrary to our holding then, the provision does not outlaw "commonplace statements and actions" or "general immigration advocacy." *Hansen*, 25 F.4th at 1107, 1110. We reached this erroneous conclusion by broadly defining "encourage" and "induce" under ordinary dictionary definitions without checking whether the terms are

specialized terms-of-art in the criminal law context. *Id.* at 1108–09. Indeed, we've recognized that this language criminalizes criminal complicity many times before, and it's unclear why we failed to do so here. *See, e.g.*, *Lopez*, 484 F.3d at 1199 ("[W]e have stated that an abettor is one who, with *mens rea* commands, counsels or otherwise encourages the perpetrator to commit the crime." (simplified)).

The statutory structure also supports reading the provision as a solicitation and facilitation law. First, although the statute is silent on this question, we have held that § 1324(a)(1)(A)(iv) requires a criminal mens rea consistent with criminal complicity. "[T]o convict a person of violating section 1324(a)(1)(A), the government must show that the defendant acted with criminal intent, i.e., the intent to violate United States immigration laws." *United States v. Yoshida*, 303 F.3d 1145, 1149 (9th Cir. 2002) (simplified). So, under our own interpretation, to convict a person under subsection (iv), the defendant must encourage or induce an alien to enter the United States with "the intent to violate United States immigration laws." *Id.* (simplified). This mens rea requirement makes clear that subsection (iv) is a solicitation and facilitation provision because a defendant must act with "criminal intent." *Id.*

Second, the offense at issue in this case requires proof that the defendant acted to obtain "commercial advantage or private financial gain." 8 U.S.C. § 1324(a)(1)(B)(i). So when subsection (iv) is charged with § 1324(a)(1)(B)(i), as here, it requires a financial incentive—a common criminal purpose. That eliminates the concern "that commonplace statements" about politics or immigration policy would be swept up by § 1324(a)(1)(A)(iv)—as our court imagined. *Hansen*, 25 F.4th at 1110. Any statements prosecuted under

this law must be designed to make money off the targeted aliens—fitting solicitation and facilitation.

Finally, as we recognized, "the subsection requires the encouragement or inducement of a specific alien or aliens," *Hansen*, 25 F.4th at 1108, which corresponds with the requirement for specificity in soliciting and facilitating crime. *See Williams*, 553 U.S. at 300 (emphasizing that a child-pornography solicitation statute does not target abstract advocacy because it refers to a "particular piece" of child pornography with the intent to transfer it); *see also* Volokh, *supra*, at 993–94 (recognizing that specificity is the dividing line between punishable solicitation and protected advocacy).

Once understood as a criminal solicitation and facilitation statute, the parade of horribles made up by our court fades away. We contended that the law punishes (1) "encouraging an undocumented immigrant to take shelter during a natural disaster"; (2) "advising an undocumented immigrant about available social services"; (3) "telling a tourist that she is unlikely to face serious consequences if she overstays her tourist visa"; or (4) "providing certain legal advice to undocumented immigrants." *Hansen*, 25 F.4th at 1110. But none of those examples involve any proof of "*mens rea* to achieve the commission of a particular crime." *Vidal*, 504 F.3d at 1079. That means one thing: the law does not reach abstract advocacy. It only prohibits speech that targets particular aliens with a proper criminal intent.

### iii.

Contrary to our court's reasoning, interpreting § 1324(a)(1)(A)(iv) as a solicitation and facilitation provision does not create a surplusage problem. *Hansen*

suggested that subsection (iv) could not be an aiding-and-abetting provision because § 1324(a) has another aiding-and-abetting provision. *Hansen*, 25 F.4th at 1108–09. To be sure, § 1324(a)(1)(A)(v)(II) creates criminal liability for anyone who "aids or abets the commission of any of the preceding acts"—meaning subsections (i) through (iv). But our court incorrectly took this as proof that subsection (iv) was not an aiding-and-abetting provision. *See Hansen*, 25 F.4th at 1109 ("Interpreting subsection (iv) as different from aiding and abetting also avoids any related concerns that either it or § 1324(a)(1)(A)(v)(II) is superfluous.").

But the surplusage canon is only employed to avoid "entirely redundant" provisions in a statute. *Kungys v. United States*, 485 U.S. 759, 778 (1988) (plurality opinion). It only comes into play if an interpretation would render one provision as having "no consequence." *Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019) (plurality opinion) (simplified). We have none of these concerns here.

First, we ignored analyzing § 1324(a)(1)(A)(iv) as a solicitation provision. If we had, we would have recognized that no other provision of § 1324 punishes solicitation. So that's one reason why there's no surplusage problem here.

And second, subsection (iv) and subsection (v)(II) prohibit the aiding and abetting of different things. As we have previously recognized:

> The "encourages or induces" offense, § 1324(a)(1)(A)(iv), criminalizes the act of encouraging *the alien herself* to illegally enter or reside in the United States, whereas aiding and abetting the principal in a "bringing to" offense, § 1324(a)(2)(B)(ii), criminalizes the act of aiding, counseling,

> inducing or encouraging *not the alien but the principal*, the person or venture who is illegally bringing the alien to the United States.

*United States v. Singh*, 532 F.3d 1053, 1059 (9th Cir. 2008). While *Singh* interpreted a neighboring provision, § 1324(a)(2)(B)(ii), that subsection employs identical language as § 1324(a)(1)(A)(i), and so *Singh*'s logic directly governs. Thus, subsection (iv) prohibits the aiding and abetting of an *alien* to "come to, enter, or reside in the United States" in violation of law, while subsection (v)(II) outlaws aiding and abetting a *principal* from committing the other alien-smuggling violations—"bring[ing]," "transport[ing]," and "harbor[ing]" aliens illegally. *See* 8 U.S.C. § 1324(a)(1)(A)(i)–(iii). Indeed, subsection (v)(II) can even prohibit aiding and abetting an encourager under subsection (iv). *See, e.g.*, *United States v. Lopez*, 590 F.3d 1238, 1250 (11th Cir. 2009) (recognizing that (v)(II) can harmoniously modify subsection (iv)). So again, there is no surplusage problem. We were thus wrong to invoke that canon to avoid concluding that § 1324(a)(1)(A)(iv) targets solicitation and facilitation.

Nor does the 1996 addition of subsection (v)(II) change the meaning of subsection (iv), which was enacted some 50 years prior. Our court was wrong to hold otherwise. *See Hansen*, 25 F.4th at 1108–09 ("Subsection 1324(a)(1)(A)(v)(II) . . . strongly suggests that subsection (iv) should not also be read as an aiding and abetting provision."). It would be "entirely unrealistic to suggest that Congress" meant to expand the scope of encourage and induce "by such an oblique and cryptic route" as simply adding an aiding-or-abetting provision in a different subsection 50 years later. *BP Am. Prod. Co. v. Burton*,

549 U.S. 84, 99 (2006). Indeed, "later laws that do not seek to clarify an earlier enacted general term and do not depend for their effectiveness upon clarification, or a change in the meaning of an earlier statute, are beside the point in reading the first enactment." *Gutierrez v. Ada*, 528 U.S. 250, 257–58 (2000) (simplified). So there is no reason to believe that Congress upended the well-settled meaning of "encourage" and "induce" in subsection (iv) by adding a separate aiding-and-abetting provision. From the day they were enacted to today, those terms have referred to the same thing—solicitation and facilitation.

## iv.

Even if any doubt remains about § 1324(a)(1)(A)(iv)'s reach, under the constitutional avoidance canon, we are required to construe the provision as a criminal solicitation and facilitation provision. When "a serious doubt" is raised about the constitutionality of an act of Congress, it is a "cardinal principle" that courts will "first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (simplified). If a "fairly possible" interpretation averts a clash with the Constitution, *id.*, we must follow it. *See Boos v. Barry*, 485 U.S. 312, 330–31 (1988) (explaining that federal courts not only have the "power" but also "the duty" to narrowly construe federal statutes when possible to avoid constitutional issues). Such a doctrine is rooted in the separation of powers; we respect Congress by not holding that it violated its duty to follow the Constitution unless it's necessary.

We've had no problems liberally applying the canon to avoid constitutional questions in the past—especially in the immigration context. *See, e.g.*, *Rodriguez v. Robbins*,

804 F.3d 1060, 1078–85 (9th Cir. 2015) (construing 8 U.S.C. §§ 1225(b), 1226(c) and 1226(a) to require a bond hearing despite the statutory text), *rev'd sub nom. Jennings*, 138 S. Ct. at 852. Indeed, we've invoked the canon even when it "inflict[ed] linguistic trauma" on the text of the statute. *Jennings*, 138 S. Ct. at 848. That's why it's baffling that our court decided to give the canon short shrift here.

Not only is it "fairly possible" to construe § 1324(a)(1)(A)(iv) as a solicitation and facilitation provision, it's the best reading. Hundreds of years of authorities use "encourage," "induce," and other near synonyms to define solicitation and facilitation. Further, the structure of § 1324(a)(1)(A) supports reading subsection (iv) that way. The provision's mens rea requirement, the financial-gain element, and specificity all narrow its scope. Given that the provision is "readily susceptible" to a construction that avoids protected speech, we should've adopted it. *Stevens*, 559 U.S. at 481 (simplified). Our court's only response is that "the plain meaning of subsection (iv) does not permit the application of the constitutional avoidance canon," *Hansen*, 25 F.4th at 1110—but as the above shows, that's wrong.

Rather than force the statute into a direct collision with the Constitution, we should have taken the more textually appropriate road and read § 1324(a)(1)(A)(iv) as a solicitation and facilitation provision. Under this interpretation, the law easily survives First Amendment scrutiny and there is no reason to reach the overbreadth doctrine. But even if this law reaches some speech, it is a poor candidate for overbreadth invalidation.

## III.

### A.

The overbreadth doctrine is the nuclear option of First Amendment law. With it, a federal court can essentially level a federal statute if the law "prohibits a substantial amount of protected speech." *Williams*, 553 U.S. at 292. Such a doctrine is a facial challenge on steroids. With facial challenges, courts may only invalidate a law if "no set of circumstances exists under which the [law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). But with overbreadth, courts may wipe out laws merely by finding that a "substantial amount" of protected speech is impacted, even if "some of [the law's] applications [are] perfectly constitutional." *Williams*, 553 U.S. at 292.

That's a huge expansion of our Article III powers. So to balance-out that power, courts must "vigorously enforce[] the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Id.* And "there must be a realistic danger" that the statute "significantly compromise[s] First Amendment protections." *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984). "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Id.* at 800. Overbreadth invalidation is "strong medicine" that is "not [to be] casually employed" and must only be used as an option of "last resort." *Los Angeles Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 39 (1999) (simplified).

The overbreadth doctrine should be rarely used especially because it appears to be ahistorical and atextual.

As Justice Thomas has explained, the doctrine first arrived in the mid-20th century with *Thornhill v. Alabama*, 310 U.S. 88 (1940), with no indication that the doctrine was rooted in the history or text of the First Amendment. *Sineneng-Smith*, 140 S. Ct. at 1583 (Thomas, J., concurring). Rather, the Court has justified overbreadth invalidation in terms of "policy considerations and value judgments." *Id.* at 1584. It has said that First Amendment freedoms are "supremely precious" with "transcendent value to all society," and so a court may strike down a statute if it decides that "the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted[.]" *Id.* (simplified); *see generally* Richard H. Fallon, *Making Sense of Overbreadth*, 100 Yale L. J. 853, 855 (1991) (explaining in detail how "First Amendment overbreadth is largely a prophylactic doctrine, aimed at preventing a chilling effect" (simplified)).

Essentially, Justice Thomas observed that the doctrine lets judges decide what "serves the public good." *Sineneng-Smith*, 140 S. Ct. at 1584. But as he notes, there is no historical evidence to suggest judges were given such a power "to determine whether particular restrictions of speech promoted the general welfare." *Id.* (quoting Jud Campbell, *Natural Rights and the First Amendment*, 127 Yale L. J. 246, 259 (2017)). In Justice Thomas's view, the overbreadth doctrine is just "the handiwork of judges, based on the misguided notion that some constitutional rights demand preferential treatment." *Id.* at 1588 (simplified).

Indeed, to apply the doctrine, judges must become storytellers and bean counters. We first make up the most outrageous violations of free speech we can think of and then count whether those imaginary scenarios are "substantial"

enough. Such a creative calculus is beyond our competence. We are at our best when we stick to the facts presented in the record—not when we speculate about "imaginary cases" and sift through "an endless stream of fanciful hypotheticals." *See id.* at 1586 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) and *Williams*, 553 U.S. at 301) (simplified). Those balancing and policy judgments are best left to *elected* officials.

On top of its suspect historical roots, the overbreadth doctrine also clashes with traditional standing principles. Ordinarily, the rule is that a person may not challenge a law that "may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973). But overbreadth is "a constitutional anomaly" that relaxes the standing requirement to protect against the chilling of speech. *United States v. Yung*, 37 F.4th 70, 76 (3rd Cir. 2022); *see also Sineneng-Smith*, 140 S. Ct. at 1586–87 (Thomas, J., concurring) (explaining the overbreadth doctrine's departure from traditional standing principles). Just recently, the Court has reasserted its preference for a "strict standard for facial constitutional challenges" and has eschewed the dilution of the "third-party standing doctrine." *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2275 (2022).

Given the overbreadth doctrine's shaky foundation, we must be cautious in deploying it. While we have a duty to follow Supreme Court precedent, we must also "resolve questions about the scope of [] precedents in light of and in the direction of the constitutional text and constitutional history." *Edmo v. Corizon, Inc.*, 949 F.3d 489, 506 (9th Cir. 2020) (Bumatay, J., dissenting from the denial of rehearing en banc) (simplified). The text and history here counsel us not to expand the doctrine, but to pause before applying it.

*See Yung*, 2022 WL 2112794, at *2 ("Courts must hesitate before stopping the government from prosecuting conduct that it has the power to ban.").

## B.

Here there's no justification for deploying the nuclear option.   Even if § 1324(a)(1)(A)(iv) somehow reaches protected speech, that reach is far outweighed by the provision's broad legitimate sweep.   Consider just a few concrete examples of the activity legitimately punishable by subsection (iv):

- Escorting illegal aliens onto a plane bound for the United States. *Yoshida*, 303 F.3d at 1150.

- Arranging fraudulent marriages for aliens to receive permanent residency. *United States v. Lozada*, 742 F. App'x 451, 453–55 (11th Cir. 2018) (unpublished).

- Selling H-2B work visas to illegal aliens for American jobs that don't exist. *United States v. Pena*, 418 F. App'x 335, 338–39 (5th Cir. 2011) (unpublished).

- Facilitating the employment of illegal aliens by providing them with fraudulent social security numbers. *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1295–97 (11th Cir. 2010).

- Picking up illegal aliens from the Bahamas and boating them to the United States. *United States v. Lopez*, 590 F.3d 1238, 1252 (11th Cir. 2009).

- Providing fraudulent travel documents and instructions to illegal aliens to facilitate travel to the United States. *Tracy*, 456 F. App'x at 269–71.

- Lying on behalf of an illegal-alien passenger to an immigration inspector about the alien's citizenship and purpose for entry. *United States v. One 1989 Mercedes Benz*, 971 F. Supp. 124, 128 (W.D.N.Y. 1997).

What's on the other side of the ledger? According to our court, there's *United States v. Henderson*, 857 F. Supp. 2d 191 (D. Mass. 2012) and some inapposite hypotheticals. But on closer inspection, those examples don't help our court's case.

Our court cites *Henderson* for the proposition that a person could be prosecuted under § 1324(a)(1)(A)(iv) for simply advising an alien "generally about immigration law practices and consequences." *Hansen*, 25 F.4th at 1111 (quoting *Henderson*, 857 F. Supp. 2d at 193). But we only tell half the story. In that case, the government prosecuted a U.S. Customs and Border Patrol supervisor for employing an undocumented alien, knowing that the employee was in the country illegally and even coaching the employee on how to evade immigration authorities while residing in the country. *Henderson*, 857 F. Supp. 2d at 195–97. The district court reversed the conviction and doubted that the facts supported a conviction, and the government never retried the case. *Id.* at 200–14. *Henderson* is thus a poor reason to invalidate an entire law. Even if Henderson were convicted under a properly construed § 1324(a)(1)(A)(iv) (as a solicitation and facilitation statute), it's doubtful the First Amendment permits a CBP supervisor, whose job includes enforcing immigration laws, to knowingly violate those laws

by employing an illegal alien and advising that alien on how to reside in the country illegally.

And as discussed earlier, our court's hypotheticals are irrelevant. For example, we say that the phrase—"I encourage you to reside in the United States"—is prosecutable under § 1324(a)(1)(A)(iv). *Hansen*, 25 F.4th at 1110 (citing *Williams*, 553 U.S. at 300). But that's not true under the proper reading of the statute. That statement doesn't direct a specific alien to violate the law and doesn't show the speaker's intent to violate immigration law. So while *Williams* noted the line between abstract advocacy and criminal solicitation, the provision can't target abstract advocacy under a proper interpretation.

So even if we apply the overbreadth doctrine, I can't find any—let alone a substantial amount of—protected speech that can be swept up by the provision's reach. It was thus inappropriate for us to invalidate § 1324(a)(1)(A)(iv) for overbreadth. By doing so, we "short circuit the democratic process by preventing [a] law[] embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Republican Party*, 552 U.S. at 451.

## IV.

For these reasons, I respectfully dissent from the denial of rehearing en banc.

COLLINS, Circuit Judge, dissenting from the denial of rehearing en banc:

For reasons similar to those recounted in Judge Bumatay's dissent, I conclude that (1) under the canon of constitutional avoidance, we can and should interpret the statute at issue here as being limited to soliciting and facilitating the unlawful entry of, or the unlawful taking up of residence by, specific aliens;[1] and (2) so construed, the statute is not facially unconstitutional. *See Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 239 (2010) (stating that, under "the canon of constitutional avoidance," a reading of the statutory words that is "fairly possible" and

---

[1] This reading of the statute is narrower than the one that the Government apparently advocated in *United States v. Hernandez-Calvillo*, ___ F.4th ___, 2022 WL 2709736 (10th Cir. 2022). There, the defendants' charge for conspiring to violate 8 U.S.C. § 1324(a)(1)(A)(iv) apparently rested on the theory that the object of their illegal employment scheme was to encourage and induce aliens who were *already* unlawfully present in the U.S. to *continue* that unlawful presence. It is not clear to me that the statute should be read so broadly. The prohibition on encouraging or inducing a particular alien to "come to, enter, or reside in the United States," 8 U.S.C. § 1324(a)(1)(A)(iv), is most naturally read, I think, to reach those who encourage or induce particular aliens to *acquire* an unlawful presence or residence that they do not already have. (One does not normally speak of "inducing" another to do what he or she is already doing.) Moreover, the first two listed verbs ("come to" and "enter") plainly refer to such an acquisition, and under the principle of *noscitur a sociis*, the third verb ("reside in") should be read the same way. *See Yates v. United States*, 574 U.S. 528, 543 (2015) (stating that the principle "avoid[s] ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress" (citation omitted)). The prosecution in Defendant Helaman Hansen's case is fully consistent with this narrower reading, because his indictment rests on the theory that he used his sham adult-adoption program to persuade two specific aliens to overstay their visas *before* their visas had expired.

that avoids the constitutional difficulty is to be preferred); *cf.
also United States v. Williams*, 553 U.S. 285, 298–300
(2008) (holding that solicitation of an illegal transaction is
"categorically excluded from First Amendment protection").

Facial invalidation is particularly inappropriate here,
given that Defendant Helaman Hansen was convicted of an
*aggravated* version of the § 1324(a)(1)(A)(iv) offense, one
that required the Government to prove the additional fact
that Hansen acted "for the purpose of commercial advantage
or private financial gain." 8 U.S.C. § 1324(a)(1)(B)(i).
Because proof of that specific purpose raised the applicable
statutory maximum from 5 years to 10 years, *compare id.
with id.* § 1324(a)(1)(B)(ii), that purpose constitutes an
element of Hansen's offense and was required to be found
by the jury beyond a reasonable doubt. *Apprendi v. New
Jersey*, 530 U.S. 466, 490 (2000). In Hansen's case, the jury
in its verdict made such a specific finding as to both of the
§ 1324(a)(1)(A)(iv) charges against him. Hansen therefore
did *not* suffer any conviction for the lesser offense, but *only*
for the greater one. Accordingly, the relevant First
Amendment issue before the panel in this case was whether
the statutory language defining the aggravated version of the
offense at issue—*i.e.*, the offense defined by 8 U.S.C.
§ 1324(a)(1)(A)(iv), (B)(i)—is facially unconstitutional.
That question is easy. The additional element of acting "for
the purpose of commercial advantage or private financial
gain," *id.* § 1324(a)(1)(B)(i), substantially narrows the reach
of the relevant language in a way that, in my view, leaves
little doubt that its "plainly legitimate sweep" greatly

exceeds any plausible overbreadth.[2]    *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973).

For these reasons, I agree that the panel seriously erred in facially invalidating the relevant statute, and I respectfully dissent from our failure to rehear this case en banc.

---

[2] This represents an additional point of distinction between this case and *Hernandez-Calvillo*. There, the court concluded that, on the facts before it, the § 1324(a)(1)(B)(i) "enhancement does not apply to [the defendants'] offense" and "is therefore not an element of [the defendants'] crimes." 2022 WL 2709736, at *8 n.19. Here, by contrast, the opposite is true.